NEWTON HOUSING AUTHORITY, third-party plaintiff, *vs.*
CUMBERLAND CONSTRUCTION CO. INC. & another,
third-party defendants & other third-party claims.[1]

Middlesex.    January 16, 1976. — January 3, 1977.

Present: KEVILLE, GOODMAN, & ARMSTRONG, JJ.

*Contract,* Building contract. *Guaranty. Practice, Civil,* Master: report of evidence. *Lien,* Attorney's lien. *Attorney at Law.*

A general guaranty clause in a contract between a city's housing authority and a construction company did not supplant the authority's common law right to recover contract damages for defective work

---

[1] The litigation was begun by Santorelli Bros. Inc., a masonry subcontractor who brought an action against Cumberland Construction Co. Inc. (Cumberland) and the Newton Housing Authority (the Authority) alleging that Cumberland owed it money under the masonry subcontract; it sought to reach and apply, in satisfaction of the debt, money allegedly owed by the Authority to Cumberland under the general contract. Cumberland then brought a claim against the Authority alleging that the Authority owed it money under the general contract. The Authority thereupon brought a counterclaim against Cumberland alleging that Cumberland's performance of the general contract was defective; the Authority later added as a defendant American Employers Insurance Co., the surety on Cumberland's bond. Thereafter various third-party complaints, including those described in the second part of this opinion, were filed. (Cumberland and American Employers Insurance Co. having acted together during this litigation and on the appeal, reference to Cumberland in a procedural context will include American Employers Insurance Co.)

[5-6]; nor was there any basis in the record for the contractor's contention that the authority was required to avail itself of the general guaranty as a means of mitigating damages [6-7].

General Laws c. 221, § 50, the attorney's lien statute, applies to multiparty litigation. [7-8]

BILL IN EQUITY filed in the Superior Court on August 28, 1970.

The suit was heard by *Dimond, J.,* on a master's report.

*George Michaels* for Cumberland Construction Co. Inc. & another.

*Harry T. Daniels* for Newton Housing Authority.

*Paul P. Baillargeon* for Del's Manufacturing Co.

GOODMAN, J. This litigation involves a number of claims which have been tried together and sought damages resulting from alleged breaches of various contracts involved in the construction of a housing project in Newton — including the general contract awarded by the Authority to Cumberland for the construction of the project, a subcontract for the performance of the roofing and sheet-metal work in the project, and two contracts through which certain doors were supplied to Cumberland for use in the project. The case was referred to a master and later recommitted to him. Thereafter Cumberland filed a number of objections to the master's report and moved to have the report recommitted again. The trial judge denied the motion to recommit and filed a "Memorandum and Order for Judgment" in which he sustained some and overruled the remainder of Cumberland's objections, ordered that the report as modified be confirmed, and ordered the entry of judgment as to all the claims. Cumberland appealed from the judgment so entered.

1. Cumberland attacks that portion of the judgment entered as to the counterclaim brought against it by the Authority which alleged various defects in Cumberland's performance of the general contract. We summarize the subsidiary findings of the master which give a background for Cumberland's contentions.

Construction of the project began on August 4, 1969.

Cumberland's subcontractor for the installation of roofing and sheetmetal was Richard E. Moore Co., Inc. (Moore). The subcontract provided that Moore was to line the gutters of the buildings with sheets of a metal alloy composed of titanium, copper, and zinc and that it should install these sheets in accordance with the manufacturer's recommended practices. The manufacturer of the sheets of alloy, which Moore used for the job, recommended that the sheets be joined by "3/4 inch locked soldered seam[s]" and that provision be made for expansion and contraction by the installation of expansion joints. Moore failed to join the sheets by the recommended seams and installed no expansion joints. Moore's performance of its subcontract was defective in a number of other respects as well.

The general contract between the Authority and Cumberland contained a "general guaranty" which provided that Cumberland "shall remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment, or from the date of the Local Authority's use or occupancy of the project as a whole, whichever is earlier." The general guaranty also provided that the Authority "will give notice of observed defects with reasonable promptness." The full text of the general guaranty is set out in the margin.[2]

---

[2] "GENERAL GUARANTY

"Neither the final certificate of payment nor any provision in the Contract nor partial or entire use or occupancy of the premises by the Local Authority shall constitute an acceptance of work not done in accordance with the Contract or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship. The Contractor shall remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment, or from the date of the Local Authority's use or occupancy of the project as a whole, whichever is earlier, and in accordance with the terms of any special guarantees provided in the Contract. Neither the foregoing nor any provision in the Contract Documents, nor any special guarantee time limit shall be held to limit the Contractor's liability for defects to less than the legal limit of liability in accordance with the law of the place of building.

On August 17, 1970, the Authority, after its final inspection of the housing project, issued to Cumberland a memorandum of acceptance of the project, effective that day, for use and occupancy of all the buildings. Simultaneously the Authority compiled and gave to Cumberland a "punch list" of work still to be completed or corrected. On September 16, 1970, the Authority gave Cumberland another such list. Each list contained a request that Cumberland correct specified defects in Moore's roofing work. Thus the first list contained a request that "metal edging and ends of gutters ... be corrected," and the second a request that "metal edging on roof ... be nailed. Gutter work completed." Cumberland apparently repaired the listed items. Neither list specifically mentioned Moore's failure to use proper seams and install expansion joints in the gutter lining system.

In December, 1970, or January, 1971, the Authority complained to Moore that the roofs of the buildings leaked. Moore sent some employees to the project, and they attempted to repair those seams between the sheets of metal alloy which they found had separated. The repairs were only temporarily successful. On May 21, 1971, the Authority again gave Cumberland a punch list of work to be corrected containing requests that Cumberland repair various specified leaks in the roofs of the buildings[3] but not mentioning Moore's failure to use the correct seams and install expansion joints. Again Cumberland apparently repaired the items.

In spite of the repairs made by both Cumberland and Moore the roofs of the buildings continued to leak, par-

---

The Local Authority will give notice of observed defects with reasonable promptness. The Contractor shall also comply with the guaranty for lawns and planting work stipulated in the Technical Specifications for that branch of the work."

[3] The requests were the following: "Correct the leaks in 10 stairwell roofs, e.g., repair flashing and pitch the gutters properly to the roof. Repair leak in ceiling of laundry room. Repair leaks in ceilings of rubbish rooms in Building 'B' and 'C'. The ceiling and wall damages reported in apartments resulting from leaks will require repainting and appears in seven different apartments."

ticularly during succeeding winters. This leakage resulted from Moore's failure to install the gutter lining system in accordance with the practice recommended by the manufacturer of the sheets of metal alloy and from certain other defects in Moore's work. The leakage damaged the first floor apartments and the central common hallways of the buildings. The master, in his general findings, concluded that Cumberland had breached the general contract and awarded damages both for the cost of replacing the gutter lining system and the cost of repairing the damage done by the roof leakage. Cumberland's attack on the master's report is based on two different, although related, grounds.

Its first contention, in substance, is that the general guaranty (see fn. 2) supplanted the Authority's common law right to recover from Cumberland contract damages for defective work (see *Ficara* v. *Belleau*, 331 Mass. 80, 81 [1954]; Restatement: Contracts, § 346 [1932]) and barred recovery unless the Authority had, under the general guaranty, given Cumberland notice of and requested that it remedy Moore's failure to install the gutter lining system and unless Cumberland had thereupon refused to remedy the defects in the system. The trial judge, in his "Memorandum and Order for Judgment" rejected this contention stating that a request by the Authority under the general guaranty that Cumberland remedy defects was not a condition precedent to a recovery by the Authority of damages arising from those defects in an action for breach of contract.

We agree with the trial judge. An English text writer, discussing construction contract clauses similar to the general guaranty, has stated: "In the absence of express provision the remedies under these clauses are in addition to and not in substitution for the common law rights, and even where the defects have appeared within the [guaranty] period the employer may sue for damages rather than call on the contractor to do the work . . . ." Hudson, Building and Engineering Contracts, pp. 396-397 (1970). See *Hancock* v. *Brazier*, [1966] 2 All E.R. 901, 904 (C.A.

1966). The general contract between the Authority and Cumberland contains no express provision stating that the guaranty clause is to supplant the Authority's common law right to bring an action for breach of contract against Cumberland. Indeed, the general guaranty begins with the broad provision: — "Neither . . . any provision in the Contract nor partial or entire use or occupancy of the premises by the Local Authority shall constitute an acceptance of work not done in accordance with the Contract or relieve the Contractor of . . . responsibility for faulty materials or workmanship." And it includes the statement: "Neither the foregoing nor any provision in the Contract Documents, nor any special guaranty time limit shall be held to limit the Contractor's liability for defects to less than the legal limit of liability in accordance with the law of the place of building." Compare the contract clause considered in Parker and Adams, The AIA Standard Contract Forms and the Law, pp. 38-39 (1954). Contrast *Mansfield* v. *Beard,* 82 N.Y. 60, 63, 64-65 (1880). We think the parties' intent is clear that the Authority should retain the option, in the event Cumberland's performance of the contract was defective, to bring an action for breach of contract against Cumberland rather than to request under the general guaranty that Cumberland remedy the defective work. See *Malden Knitting Mills* v. *United States Rubber Co.* 301 Mass. 229, 233 (1938).

Cumberland's other contention is that even if the general guaranty did not supplant the Authority's right to recover damages from Cumberland in an action for breach of contract, the Authority was required to avail itself of the general guaranty as a means of mitigating damages. It is asserted that, if the Authority had requested that Cumberland make the necessary repairs under the general guaranty, Cumberland could have itself replaced the gutter lining system and repaired the damages done by the leaks at a lesser cost than could an outside contractor hired by the Authority. See Hudson, Building and Engineering Contracts, p. 394 (1970).

This contention does not appear to have any basis in

the master's report. Although the master found that the leaks in the roof first manifested themselves in the winter of 1970-1971, it is not at all clear that the Authority knew or could reasonably have discovered that the cause of those leaks was the defective installation of the gutter lining system, so that it might have invoked the general guaranty. And it is not apparent from the master's report that the Authority's May, 1971, punch list (see fn. 3) did not constitute as detailed a request that Cumberland repair the leaks as the Authority could reasonably have been expected to have made.

In any event, this argument is not open to Cumberland on the record before us. The master's report contains no finding that Cumberland could have replaced the gutter lining system and repaired the damage done by the roof leaks at less cost than an outside contractor. None of the objections to the master's report filed by Cumberland attacked the master's failure to make such a finding; nor could such an objection have succeeded in view of Cumberland's failure to request that the master appoint a stenographer to report the evidence taken at the hearing before him. *Buckley & Scott Util. Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 507-508 (1943). Superior Court Rule 90 (1954). See now Superior Court Rule 49, § 7 (1974). The master's general finding as to damages must therefore stand.

2. In its counterclaim against Cumberland the Authority also sought damages for Cumberland's installation of defective doors in the housing project. Cumberland in turn filed a third-party complaint seeking damages from Del's Manufacturing Co. (Del) which had supplied it with the doors, and Del then brought an action seeking damages from V.P. Winter Distributing Co. (Winter) from which it had obtained the doors. The master found liability in the same amount by Cumberland to the Authority, by Del to Cumberland, and by Winter to Del. The trial judge ordered that judgment enter accordingly.

Cumberland filed a motion seeking to reach and apply Del's judgment against Winter in satisfaction of its judg-

ment against Del. Del then moved, under G. L. c. 221,
§ 50[4] (second sentence), as appearing in St. 1945, c. 397,
§ 1, that the trial judge, before granting Cumberland's mo-
tion, establish a lien on its judgment against Winter in
favor of its attorney, Mr. Paul Baillargeon, for his reason-
able fees and expenses. The trial judge found that Mr.
Baillargeon's reasonable fees and expenses were $4,362.14
and declared that sum to be a "charging lien" (*Elbaum* v.
*Sullivan,* 344 Mass. 662, 663 [1962]) on the judgment to
be entered in favor of Del against Winter. The trial judge
then allowed, subject to Mr. Baillargeon's prior lien, Cum-
berland's motion to reach and apply the judgment to be
entered for Del. We reject Cumberland's contention that
the trial judge erred in establishing a lien in favor of Mr.
Baillargeon on Del's judgment against Winter.

We see nothing in the contention that the attorney's
lien statute does not apply to multiparty litigation, nor do
we see any relevance in the citation of G. L. c. 149, § 29,
which was "designed to afford security to those who have
contracted to furnish labor, equipment, or materials on
public work." *Warren Bros. Roads Co.* v. *Joseph Rugo,
Inc.* 355 Mass. 382, 386 (1969). The short answer is that
the attorney's lien statute, by its terms, applies not only
to "action[s]" but also to "counterclaim[s] or other pro-
ceeding[s]." Cumberland's position seems to us no differ-
ent from that of any creditor seeking to reach and apply
a recovery by his debtor subject to an attorney's lien. The
creditor's action cannot vitiate the lien. See *Thayer* v.

---

[4] General Laws c. 221, § 50 (attorney's lien statute) provides:
"From the authorized commencement of an action, counterclaim or
other proceeding in any court, or appearance in any proceeding be-
fore any state or federal department, board or commission, the at-
torney who appears for a client in such proceeding shall have a lien
for his reasonable fees and expenses upon his client's cause of action,
counterclaim or claim, upon the judgment, decree or other order in his
client's favor entered or made in such proceeding, and upon the pro-
ceeds derived therefrom. Upon request of the client or of the attorney,
the court in which the proceeding is pending or, if the proceeding is
not pending in a court, the superior court, may determine and enforce
the lien; provided, that the provisions of this sentence shall not apply
to any case where the method of the determination of attorneys' fees
is otherwise expressly provided by statute."

*Daniels,* 113 Mass. 129, 131-132 (1873); *Delval* v. *Gagnon,* 213 Mass. 203, 206-207 (1912). He can reach only what the debtor can assign. *Bethlehem Fabricators, Inc.* v. *H.D. Watts Co.* 286 Mass. 556 (1934). And the debtor can assign only subject to the lien. See *Bruce* v. *Anderson,* 176 Mass. 161, 162 (1900). We see nothing in principle which distinguishes this case from the setting off of judgments, which does not deprive the attorney of his lien. *Dunklee* v. *Locke,* 13 Mass. 525, 527-528 (1816). *Ocean Ins. Co.* v. *Rider,* 22 Pick. 210 (1839). *Murphy* v. *Brilliant Co.* 323 Mass. 526, 532 (1948). Cf. *Old Colony Tr. Co.* v. *National Non-Theatrical Motion Picture Bureau, Inc.* 274 Mass. 377, 380 (1931), in which the attorney was held to have waived his lien. Had Del chosen — as it might have, cf. *Jenkins* v. *General Acc. Fire & Life Assur. Corp. Ltd.* 349 Mass. 699, 701 (1965) — to bring a separate action against Winter rather than to proceed under G. L. c. 231, § 4B, prior to its amendment by St. 1973, c. 1114, § 151 (see now Mass.R.Civ.P. 14, 365 Mass. 760 [1974]), Cumberland's recovery in its action against Del could not have interfered with the attorney's lien on Del's recovery against Winter.

Finally, Cumberland contends that the trial judge erred in granting Mr. Baillargeon a lien for the full amount of his reasonable fees and expenses. Cumberland argues that Mr. Baillargeon was entitled to a lien only for his fees for services performed in prosecuting Del's suit against Winter and not for services performed in defending Cumberland's suit against Del, that Mr. Baillargeon has failed to sustain his burden of proving which fees were related to which case, and therefore that he is entitled to no lien. However, on the assumption (made by the trial judge and urged by Cumberland) that Mr. Baillargeon was entitled to a lien only for his fees for services performed in prosecuting Del's suit against Winter (cf. *United States* v. *Preston,* 232 F. 2d 77, 80-81 [9th Cir.], cert. den. 352 U. S. 871 [1956]; Annot. 97 A.L.R. 1133, 1135-1139 [1935]), the contention is answered in the finding of the trial judge: "Since the defense of the claims by Cumberland and the assertion of the same claim against Winter are actually different faces of the same coin, it is not practically feasi-

ble to allocate Mr. Baillargeon's services to either aspect separately. In any event, substantially the same work was involved in each of them." This finding that Mr. Baillargeon performed substantially the same work in both cases is controlling, for the evidence is not reported. *Check v. Kaplan,* 280 Mass. 170, 173-174 (1932). *Sarnow v. Sarnow,* 359 Mass. 764 (1971). This finding, in effect that all Mr. Baillargeon's work contributed to the recovery against Winter, is a sufficient basis for the lien in the full amount. That the same work may also have contributed to the unsuccessful defense of Del's claim against Cumberland does not derogate from the value of his services to Del in recovering from Winter an asset which Del could use to pa-- other creditors. Indeed, the recovery against Winter w- of value to Cumberland itself, for it made an addition-- asset available to it.[5]

*Judgment affirmed.*

---

[5] At oral argument Del presented a motion that this court determine and enforce a lien on Del's judgment against Winter for services rendered by Mr. Baillargeon in connection with Cumberland's appeal. The motion is denied. Without pausing to analyze the applicability to this court of G. L. c. 221, § 50, it is clear in this case that Mr. Baillargeon's services were rendered merely in defending the validity of his lien.